**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
JOSEPH A. FERRARA, SR., FRANK H.
FINKEL, MARC HERBST, DENISE
RICHARDSON, ANTHONY D'AQUILA,
THOMAS F. CORBETT, THOMAS              **MEMORANDUM OF**
GESUALDI, LOUIS BISIGNANO,            **DECISION AND ORDER**
DOMINICK MARROCCO, and ANTHONY         11–CV–408 (ADS) (WDW)
PIROZZI, as Trustees and Fiduciaries of the
Local 282 Welfare Trust Fund, the Local 282
Pension Trust Fund, the Local 282 Annuity Trust
Fund, the Local 282 Job Training Trust Fund,
and the Local 282 Vacation and Sick Leave
Trust Fund,

                    Plaintiffs,

            -against-

OAKFIELD LEASING INC., CORAL
INDUSTRIES INC., and MICHAEL N.
BABINO, JR.,

                    Defendants.
------------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Cohen, Weiss and Simon LLP**
*Attorneys for the Plaintiffs*
330 West 42nd Street
New York, New York 10036
        By:    Peter DeChiara, Esq.,
               Zachary N. Leeds, Esq., Of Counsel

**The Ziskin Law Firm, LLP**
*Attorneys for the Defendant Oakfield Leasing, Inc.*
6268 Jericho Turnpike, Suite 12A
Commack, NY 11725
        By:    Richard B. Ziskin, Esq., Of Counsel

**Dandeneau & Lott**
*Attorneys for the Defendants Coral Industries and Michael N. Babino, Jr.*
425 Broadhollow Road
Melville, NY 11747
        By:    Gerald V. Dandeneau, Esq., Of Counsel

**SPATT, District Judge**.

The Plaintiffs commenced this action on January 27, 2011, seeking to recover from the Defendants, jointly and severally, unpaid contributions owed to the Plaintiff Funds, pursuant to Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(3) and 1145.  Presently before the Court is the Plaintiffs' motion for summary judgment, which is opposed by two of the three defendants—Coral Industries Inc. ("Coral") and Michael N. Babino Jr. ("Michael Jr.").  For the reasons set forth below, the motion is granted as to liability, but the request for damages is granted in part and denied in part.

## I.     BACKGROUND

The Plaintiffs, Joseph A. Ferrara, Sr., Frank H. Finkel, Marc Herbst, Denise Richardson, Anthony D'Aquila, Thomas F. Corbett, Thomas Gesualdi, Louis Bisignano, Dominick Marrocco, and Anthony Pirozzi (the "Trustees"), are trustees and fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund (the "Funds").  The Funds are employee benefit plans created pursuant to collective bargaining agreements ("CBAs") between Building Material Teamsters Local 282, I.B.T. (the "Union") and various employers.  The Funds are jointly administered by a Board of Trustees, comprised of both Union-appointed and employer-appointed members.  The Funds provide welfare, pension, annuity, job training, and vacation and sick leave benefits to employees that perform work covered by the CBAs.  The Funds are governed by the Funds' Restate Agreement and

Declaration of Trust (the "Trust Agreement"), which in turn is incorporated by reference in the CBAs.

Under the terms of the CBAs, the employers are required to contribute to the Funds for hours worked by their employees at rates that are specified in the CBAs. The Trust Agreement specifically requires such employers to submit remittance reports to the Funds that reflect the number of hours worked by their employees in covered employment and the corresponding contributions. In order to verify the accuracy of these remittance reports, the Funds conduct regular audits of employers, and may conduct an audit "at any time" pursuant to the Trust Agreement. (Cody Decl., ¶¶ 16–17.) The Trust Agreement also states that in the event an employer is delinquent in making its contributions, the employer is then liable for: (1) the delinquent contributions; (2) interest on the delinquent contributions from the first day of the month for which contributions were due to the date when payment is made; (3) liquidated damages equal to the greater of (i) the amount of interest due, or (ii) twenty percent of the delinquent contributions; (4) audit fees; and (5) attorney's fees and costs.

Beginning on July 7, 1995, the Defendant Oakfield Leasing Inc. ("Oakfield") has been a signatory to a series of CBAs with the Union. From June 1, 2006 through June 30, 2009, and from July 1, 2009 through June 30, 2012, Oakfield was bound to the terms of a CBA known as the Metropolitan Trucker's Association and Independent Trucker's Contract (the "MTA CBA"). While Oakfield did not sign the MTA CBA, there is no dispute that it adopted the CBA by its conduct and thus is bound by it. In this regard, Oakfield signed and submitted remittance reports to the Plaintiff Funds that stated "MTA" or "Metropolitan Trucker's Ass'n" on them. In addition, Oakfield contributed to the Funds at the rates set forth in the MTA CBA, and increased its contributions in accordance with that agreement. In this regard, the remittance reports stated

that "BY SIGNING THIS REPORT YOU AGREE TO ACCEPT THE TERMS OF THE

CURRENT LOCAL 282 INDUSTRY COLLECTIVE BARGAINING AGREEMENT

COVERING THE WORK PERFORMED BY YOUR EMPLOYEES."  (Pl.'s Rule 56.1 Stmt., ¶

18.)  Thus, Oakfield is undoubtedly bound as a signatory to the relevant CBAs.

According to the Plaintiffs, they sought to audit Oakfield for the period beginning on

October 1, 2008, including access to the books and records of the Defendant Coral Industries Inc.

("Coral"), because Coral was an entity affiliated with Oakfield.  However, the Funds claim that

Oakfield failed to submit to the requested audits.  (Pl.'s Rule 56.1 Stmt., ¶¶ 19–20.)  On the other

hand, the Defendants deny that Oakfield ever received an audit request, and assert that no

documentation exists to support the Plaintiff's claim that Oakfield failed to submit to an audit.

If an employer refuses to submit to an audit—as the Plaintiffs contend that Oakfield did

— the Trustee has the power to estimate the amount of contributions owed based upon formulas

contained in the Trust Agreement.  This is precisely what the Plaintiffs did in the present case.

The Plaintiffs now claim that in performing an estimated audit and applying the relevant

formulas, Oakfield owes: (1) $336,751.49 in delinquent contributions; (2) $78,600.14 in interest

for the period from October 2008 through October 2011, as well as $166.07 per diem interest,

accruing since December 16, 2011; (3) liquidated damages equal to the interest owed; and (4)

$350 for audit costs.  The Defendants do not deny that they owe the above mentioned amounts,

but rather deny liability only on the ground that they have not been supplied with documents

supporting the audit and estimations.

Philomena Babino was the owner of Oakfield since its incorporation in 1991.  She died

on May 13, 2010.  Since her death, Michael P. Babino Sr. ("Michael Sr."), her husband, has

taken over her ownership interest.  The Plaintiffs assert that Philomena's son, the Defendant

Michael N. Babino Jr. ("Michael Jr."), was previously an employee of Oakfield (Pl.'s Ex. A. at 29–30), but the Defendants deny this fact. (Babino, Jr. Decl., ¶ 3; Def.'s Ex. B at 24.) Notwithstanding this apparent factual dispute, the Defendants admit that Michael Jr. has been employed as a driver by Oakfield. (Pl.'s Rule 56.1 Stmt., ¶ 87.) Regardless, there is no dispute that Michael Jr. established Coral Industries Inc. ("Coral") in 1995. He currently owns the company and has been its only shareholder. It is undisputed that Coral has never been a signatory to any CBA with any labor organization.

Oakfield's address is, and at all times has been, 752 Oakfield Avenue, North Bellmore, New York 11710. This house is owned by Michael Sr., the father of the Defendant Michael Jr. Coral's certificate of incorporation lists the same address with the New York Secretary of State for purposes of service of process.

Both companies are in the business of providing trucking services to customers. In particular, both companies operate dump trucks to truck away construction debris or excavated materials from its customers' construction sites. (Pl.'s Ex. B at 23–24; Pl.'s Ex. C at 94.) Oakfield and Coral have rented property at 1351 Newbridge Road, Bellmore, N.Y. The companies share customers, such as Asplundh Construction ("Asplundh") and Network Infrastructure ("Network"). (Pl.'s Rule 56.1 Stmt., ¶ 71–72.) In fact, the only customers Coral has ever had are Asplundh and Network.

Oakfield and Coral utilize dump trucks, which are designated by a number that is painted on the truck. Oakfield and Coral both used Truck #11, registered to Coral, to provide services to Asplundh. (Pl.'s Rule 56.1 Stmt., ¶ 77.) Coral invoiced Asplundh for the services that Truck #11 provided on June 1, 2009, and Oakfield invoiced Asplundh for the services that Truck #11 provided on June 8, 2009. (Id.) Similarly, on October 21, 2009, Oakfield used Truck #10 to

provide services to Network at a location in Woodmere, New York, while Coral used the same truck to provide services to the same client in Woodmere, New York on the very next day. (Pl.'s Rule 56.1 Stmt., ¶¶ 81–82.) The two companies' invoices both utilized the typography of an initial small letter with the balance of the letters in capitals, such as "wOODMERE" or "rOCKAWAYS". A number of individuals, such as Joseph Mollin, Anthony Bassolino, David Hernandez, and Thomas Pelligrino, have been employed as drivers for both companies. On occasions, drivers employed by Oakfield drove trucks owned by Coral. Further, on occasions when Joseph Mollin drove for Oakfield, that company paid his wages, although he was an employee of Coral. (Pl. Ex. C at 140–41.) The Defendant Michael Jr. also performed driving services for Oakfield while driving a truck registered to Coral.

There are further undisputed instances of employees of one company performing driving services for the other company; employees of one company utilizing the trucks registered to the other company; and employees of one company being paid wages by the other company. (Pl.'s Rule 56.1 Stmt., ¶¶ 92–100.) It was not unusual for Oakfield to use Coral's trucks, and for Coral to use trucks that were registered to Oakfield. In these instances, neither company paid the other for use of the trucks, and no written agreement exists between the companies. Also, Phillip Peterson has served as the accountant for both Oakfield and Coral.

There is no dispute that Coral has never issued any stock. In addition, Michael Jr. stated at his deposition that Coral has no directors or officers. The Defendants dispute this fact, but their citation to Michael Jr.'s declaration is unrelated to the issue and thus does not support their contention. When asked at his deposition if he saw a difference between himself and Coral, Michael Jr. answered "No."

Michael Jr. received money from Coral over the years, in no particular schedule or pattern. There was no formula to determine how much money he would take from the company. Michael Jr. caused Coral to pay his house bills, including personal electric bills and telephone bills, on a regular basis. He likewise caused Coral to pay his daughter's school tuition, personal shopping expenses, and home renovation costs. Michael Jr. also caused Coral to make payments to his parents, because his parents had loaned him money to purchase his house and to assist with his divorce settlement. Thus, Michael Jr. used money from Coral to pay the debt to his parents. For instance, on August 22, 2005, Michael Jr. wrote a check on Coral's account payable to his mother, Philomena, in the amount of $602.85; on November 3, 2005, he wrote a check on Coral's account payable to Philomena in the amount of $1,500; and on December 31, he wrote a check on Coral's account payable to Philomena in the amount of $6,300. Checks of this nature were written from Michael Jr. to Philomena on Coral's account payable from August 2005 through December 2009.

The Plaintiffs commenced this action on January 27, 2011, seeking to recover from the Defendants, jointly and severally, unpaid contributions owed to the Funds, along with interest, liquidated damages, audit fees, attorney's fees and costs. In the initial complaint, the Funds stated their intention to hold not only Oakfield and Coral jointly and severally liable based upon their "single employee" relationship, but also to hold Michael Jr. and the now deceased Philomena Babino, jointly and severally liable with the corporate defendants based upon their "knowing[] . . . control over the Corporate Defendants in an ongoing scheme to defraud the Funds of contributions." (Compl., ¶ 3.) The Plaintiffs brought causes of action (1) against Oakfield for liability under the CBA; (2) against Coral based on its single employer relationship with Oakfield; (3) against Oakfield and Coral based on unpaid contributions for hours worked by

Coral's drivers; (4) against the individual defendants based on their alleged scheme to defraud the funds; and (5) against Oakfield and Coral based on their failure to submit to an audit under the Trust Agreement.

The Plaintiffs now move for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. According to the Funds, the corporate defendants are jointly and severally liable for delinquent benefit contributions plus interest, liquidated damages, attorney's fees and costs, by virtue of their single employer relationship. Further, the Plaintiffs assert that this Court should pierce the corporate veil so that the individual defendant, Michael Babino Jr. should be held personally liable jointly and severally for the damages. Only the Defendant Michael Babino and Coral, his corporation, have responded to the Funds' motion, arguing not that there are sufficient issues of material fact to warrant denial of summary judgment, but rather that there is no basis for liability against them and that the complaint should be dismissed. Oakfield did not file an opposition to the motion.

## II. DISCUSSION

### A. <u>Legal Standard on a Motion for Summary Judgment</u>

It is well-settled that summary judgment under the provisions of Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).  However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B.  As to the Recovery of the Delinquent Contributions Owed by Oakfield**

With regard to the first cause of action in the Complaint, the Plaintiffs contend that Oakfield is liable for the amount determined in the estimated audit, namely $336,751.49, in addition to interest, liquidated damages, attorney's fees, and audit costs.  The Defendant Oakfield does not oppose the summary judgment motion.  Nevertheless, "even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006).  Thus, the Court must consider whether the Plaintiffs have met their burden for obtaining summary judgment.

First, the Court must determine whether Oakfield is liable for violating section 515 of

ERISA, 29 U.S.C. § 1145.  Section 515 provides:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms
> of a collectively bargained agreement shall, to the extent not
> inconsistent with law, make such contributions in accordance with
> the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145; Greenblatt v. Delta Plumbing & Heating Corp., 68 F.3d at 561, 568 (2d Cir.

1995).

In this case, Oakfield does not contest that it is liable for contributions pursuant to the

terms of the CBAs.  Oakfield does not raise any defenses to the validity of the CBAs or claim

that the Funds are seeking contributions for work that is not covered.  Moreover, the undisputed

facts demonstrate that Oakfield employs Union members as defined by ERISA; the Plaintiffs are

trustees and fiduciaries of the Funds, which are multiemployer plans, as defined by ERISA; and

Oakfield, by its conduct, agreed to the terms of the CBAs that require employers to remit

contributions to these plans.  Yet, Oakfield failed to remit contributions for the period from

October 1, 2008 through September 30, 2009.  Thus, the failure of Oakfield to remit

contributions to the Plaintiffs violates ERISA.

ERISA enumerates the type of relief that may be awarded for a violation of section 515.

In particular, 29 U.S.C. § 1132(g)(2) provides:

> In any action under this subchapter by a fiduciary for or on behalf of a
> plan to enforce section [515] of this title in which a judgment in favor
> of the plan is awarded, the court shall award the plan-
>
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of-
> > (i) interest on the unpaid contributions, or
> > (ii) liquidated damages provided for under the plan in an
> > amount not in excess of 20 percent (or such higher percentage

> > as may be permitted under Federal or State law) of the amount
> > determined by the court under subparagraph (A)
> > (D) reasonable attorney's fees and costs of the action, to be paid by the
> > defendant, and
> > (E) such other legal or equitable as the court deems appropriate.

29 U.S.C. § 1132(g)(2). If an employer does not submit to an audit of its books and records, the

Fund office may perform an estimated audit pursuant to the Trust Agreement.

Oakfield does not dispute that the Trustees have a right to do an estimated audit if an

employer that is bound to a CBA refuses to submit to an audit. Moreover, Oakfield does not

dispute the methodology by which the Trustees computed the amount of unpaid contributions.

Coral, however, disputes whether the Trustees ever made a request to perform an audit.

Despite this objection, the Plaintiffs have submitted evidence to demonstrate that the

Trustees did in fact make the request to perform an audit. Ken Jones—an accountant from the

firm Wagner & Zwerman LLP ("W&Z")—has sworn in a declaration submitted to the Court that

W&Z sought to conduct an examination of Oakfield's records for the period from October 1,

2008 through September 30, 2009. Jones goes on to state that "on December 16, 2009, W&Z

sent a letter to Oakfield requesting access to Oakfield's records and listing the records needed."

(Jones Decl., ¶ 18.) The Plaintiffs have provided this letter to the Court as an exhibit. (Jones.

Decl. Ex. C.)

According to Jones, W&Z received no response from Oakfield. Therefore, on January 5,

2010, W&Z sent another letter to Oakfield requesting access to its records. Again, the Plaintiffs

have provided this letter as an exhibit. (Jones Decl. Ex. D.) Also, Jones has stated that

Oakfield's accountant, Phil Peterson, made an appointment to meet with someone from W&Z on

February 4, 2011, but that prior to the appointment, Peterson informed W&Z that it would not

make its records available. Accordingly, by a letter dated March 23, 2010, W&Z notified the

Funds that it was unable to conduct an audit of Oakfield. (Jones Decl., ¶ 20.) Thus, based upon the evidence presented, the Court finds that no rational juror could conclude that Oakfield was unaware that the Trustees were seeking an audit. Rather, the evidence demonstrates that the auditors communicated to Oakfield and its accountant of the Trustee's intention to do an audit.

Therefore, the Court grants the Plaintiff's motion for summary judgment as to the liability of Oakfield for delinquent contributions. The specific amount of damages will be assessed below.

**C.** **As to Whether There Is Joint and Several Liability of Coral for Oakfield's Employees**

The next issue, which forms the heart of the present dispute, is whether Coral is jointly and severally liable for the contributions owed for the work performed by Oakfield's drivers. The Plaintiffs contend that although nominally separate companies, Oakfield and Coral "constitute one tightly integrated, family-owned enterprise and are, for legal purposes, a 'single-employer.'" (Pl.'s Mem. at 1.)

Of importance, in the instant motion for summary judgment, the Plaintiffs are only asserting joint and several liability under the theory of the single employer doctrine, not the joint employer doctrine or the alter ego doctrine. Although the Defendants devote much of their opposition brief to these two latter theories, as the Plaintiffs do not rely on either theory for recovery, the Court will only address the single employer doctrine. See Lihli Fashions Corp. v. Nat'l Labor Relations Bd., 80 F.3d 743, 748 (2d Cir. 1996) (addressing the alter ego doctrine and the single employer doctrine as conceptually distinct theories); Times Square Constr., Inc. v. Mason Tenders Dist. Council, No. 07 Civ. 7250, 2008 WL 55116, at *5 (S.D.N.Y. Jan. 2, 2008) ("A conclusion that two employers are a joint employer is different from the conclusion that they are single employers"); see also Finkel v. Frattarelli Bros., Inc., No. 05 Civ. 1551, 2008 WL

2483291, at *13 n.6 (E.D.N.Y. June 17, 2008) ("Though plaintiff provides additional arguments under theories of alter ego and joint employer, having found that there is no genuine issue of material fact as to whether Frattarelli Brothers and Podesta Trucking are a single employer, the Court need not address those issues.").

"The single employer doctrine is an exception to the doctrine of limited liability in corporate law, which allows corporate entities to escape liability for the acts of a separate, related entity . . . " Carner v. MGS − 576 5th Ave. Inc., 992 F. Supp. 340, 350 (S.D.N.Y. 1998). Only in particularly exceptional instances will the employees of one entity be treated as employees of a separate, yet related, entity. See Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996) (warning that the doctrine of limited liability "allows a corporation to organize so as to isolate liabilities among separate entities"); see also Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993) (noting that the doctrine of limited liability "creates a strong presumption that a parent company is not the employer of its subsidiary's employees, and the courts have found otherwise only in extraordinary circumstances") (citing Johnson v. Flowers Indus., Inc., 814 F.2d 978, 980–81 (4th Cir. 1987)).

Under the single employer doctrine, two nominally distinct enterprises will be joint and severally liable under the CBA signed by only one when the two act as a "single integrated enterprise." Lihli, 80 F.3d at 747; see Labarbera v. Cretty Enterprises, Inc., Nos. 03 Civ. 6112, 04 Civ. 5178, 2007 WL 4232765, at *5 (E.D.N.Y. Nov. 28, 2007) ("If the two nominally separate enterprises constitute a single employer . . . then each is bound to the obligations of any collective bargaining agreement signed by the other."); see also Brown v. Sandimo Mat'ls, 250 F.3d 120, 128 n.2 (2d Cir. 2001) ("a collective bargaining agreement may be enforced against

non-signatory employers if the employers constitute a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit.").

The factors to be considered in determining whether the two entities act as a single integrated enterprise are the "interrelationship of operations, common management, centralized control of labor relations and common ownership," as well as "the use of common office facilities and equipment and family connections between or among the various enterprises." Lihli, 80 F.3d at 747 (citing Radio & Television Broadcast Tech. Local Union 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965) (per curiam); Three Sisters Sportswear Co., 312 N.L.R.B. 853, 1993 WL 398465, at *15 (N.L.R.B. Sept. 30 1993)). "[N]ot every factor need be present, and no one particular factor is controlling." Lihli, 80 F.3d at 747; see Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000) ("A crucial element of the inquiry focuses on whether the two enterprises exhibit centralized control of labor relations, including tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employer decisions."). "Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an 'arm's length relationship found among unintegrated companies.'" NLRB v. Al Bryant, Inc., 711 F.2d 543, 551 (3d Cir. 1983), cert. denied, 464 U.S. 1039, 104 S. Ct. 699, 79 L. Ed. 2d 165 (1984).

"But, critically, the determination that separate companies are a 'single employer' is not enough to bind all the separate companies to the collective bargaining agreements of any one of the companies. Rather, something more must be shown." Lihli, 80 F.3d at 748. Under the dictates of Supreme Court precedent, for one company to be bound by a collective bargaining agreement made by another company, it must be shown not only that they are a "single employer," but, additionally, that together they represent an appropriate employee bargaining

14

unit.  See South Prairie Construction Co. v. Local No. 627, 425 U.S. 800, 804–05, 96 S. Ct. 1842, 1884–85, 48 L. Ed. 2d 382 (1976) (per curiam); Local One v. Stearns & Beale, Inc., 812 F.2d 763, 769 (2d Cir. 1987) ("[T]o bind a non-signatory company to a collective bargaining agreement, both single employer and single bargaining unit status must be found."); see also Stardyne, Inc. v. NLRB, 41 F.3d 141, 144 (3d Cir. 1994) ( "When two entities are found to be a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single appropriate bargaining unit.").

### 1.  Interrelation of Operations

First, the Court will assess the interrelation of Coral's and Oakfield's operations.  "Courts in the Second Circuit have used the following criteria in analyzing the interrelation of operations between separate corporate entities for the purpose of determining single employer status: (1) involvement in daily production, distribution, marketing, and advertising decisions; (2) sharing of employees, services, records, and equipment; (3) commingling of bank accounts, inventories, and lines of credit; (4) maintenance of corporate records; and (5) preparing and filing of tax returns."  United Union of Roofers, Waterproofers, Allied Workers, Local No. 210, No. 07 Civ. 224, 2012 WL 4092598, at *10 (W.D.N.Y. Sept. 10, 2012).

In this case, the Plaintiffs have offered a plethora of evidence to demonstrate that Oakfield's and Coral's operations are interrelated.

Oakfield's address—752 Oakfield Avenue, North Bellmore, New York 11710—is the same address that Coral's certificate of incorporation lists as the location at which the New York Secretary of State may mail it service of process, and the records of the New York State Department continue to list this address for Coral.  In addition, both companies have rented property at the same location—1351 Newbridge Road, Bellmore, New York—to park their

trucks.  See LaBarbera, 2007 WL 4232765, at *5 (sharing of office space was found sufficient to meet the element of interrelationship of operations); Bourgal v. Robco Contracting Enterprises, Ltd., 969 F. Supp. 854, 863 (E.D.N.Y. 1997) ("This is significant circumstantial evidence of both single employer and alter ego status . . . Both Dana–Sal and Industries had the same address, 23 Ash Street in Brooklyn.").

Second, in the context of the maintenance of corporate records, the invoices sent by the two companies contain such striking parallels, so that there appears to be some coordination in billing.  For instance, invoices from both Oakfield and Coral have the same typographical idiosyncrasies —the word "Woodmere" is written as "wOODMERE", and letters in abbreviations such as "N-Y-C" or "L-I-E" contain internal hyphens.  Thus, it is logical to conclude that the invoices were created by the same person or on the same computer.  Moreover, Oakfield and Coral used the same accountant, further supporting a finding of interrelationship of operations.  See LaBarbera, 2007 WL 4232765, at *5 (finding that interrelationship of operations demonstrated a single employer relationship as a matter of law, in part because "[t]he companies . . . use[d] the same trucks and accountant").

In addition, Oakfield and Coral "share substantially the same business purpose."  Finkel, 2008 WL 2483291, at *10 ("Both Podesta Trucking and Frattarelli Brothers are in the business of picking up construction materials from New York City job sites.").  In particular, both companies operate dump trucks to haul away construction debris or excavated material from customers' construction sites.  Cf. Mastendrea v. Nassau Land Improvement Co., Inc., 182 F.3d 900, at *2 (2d Cir. 1999) (affirming a district court's finding that there was no single employer status "[m]ost importantly, [because] the two companies engaged in different types of work. NLIM was a landscape contracting and maintenance business focusing on private contracts

whereas Nassau did heavy highway construction and other public works projects."); <u>United</u>, 2012 WL 4092598, at *12 ("The proof at trial further establishes that the commercial roofing services provided by RCS and AWF to their customers in Erie are not functionally integrated or substantially identical.").

Next, the two companies often shared the same vehicles. Coral used trucks that were registered to Oakfield on a frequent basis, and vice versa. <u>See Bourgal</u>, 969 F. Supp. at 863 (determining that the plaintiffs had established that the corporate defendants had single employer status, in part because the companies rented trucks from each other). Even more telling, when one company would utilize a truck registered to the other company, it would not pay for that borrowing. <u>See King v. Unique Rigging Corp.</u>, No. 01 Civ. 3797, 2005 WL 2290585, at *2 (E.D.N.Y. Sept. 20, 2005) (transferring of ownership of vehicles from one company to another, without any compensation paid, supported finding of single employer relationship). <u>Cf. United</u>, 2012 WL 4092598, at *11 ("There is no showing that AWF and RCS alternately used the same equipment, treated equipment as interchangeable between the two companies, or 'used the same personnel and equipment to provide the same services to the same customers.'") (<u>quoting Duffy v. Modern Waste Services Corp.</u>, No. 09 Civ. 0655, 2011 WL 573564, at *5 (E.D.N.Y. Feb. 14, 2011)).

Furthermore, the companies exchanged drivers, thereby employing many of the same individuals. At various points in time, Coral employed as drivers Michael Jr., Joseph Mollin, Anthony Bassolino, David Hernandez, Thomas Pelligrino, Anthony Zaffuto, and Michael Zizzo. At various points in time, Oakfield also employed as drivers Michael Jr., Mollin, Bassolino, Hernandez, and Pelligrino. Critically, when Coral employees performed Oakfield driving services, Oakfield would pay their wages directly, rather than pay Coral for the services of the

Coral drivers. Thus, the two companies practically shared employees. See LaBarbera, 2007 WL 4232765, at *5.

Finally, the two companies shared the same two customers. Asplundh and Network were Oakfield's main customers and Coral's only customers. See Bourgal, 969 F. Supp. at 863 ("The corporate defendants also shared at least some of the same customers").

Therefore, when analyzing the interrelationship of operations based upon the undisputed facts, it cannot be said that the companies operated an arms-length relationship.

## 2. Centralized Control of Labor Relations

The Court will proceed to assess another crucial prong of the single employer analysis—centralized control of labor relations.

In order to determine whether two separate entities maintain centralized control over labor relations, courts look at the following factors:

> whether the companies have separate human resources departments and whether the entity establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. Other relevant factors include whether employment applications are sent to the other entity, whether the other entity must clear all major employment decisions, and whether the entities shift employees back and forth.

Finkel, 2008 WL 2483291, at *11 (internal quotation marks, alterations and citations omitted); see also Ferguson v. New Venture Gear, Inc., No. 04 Civ. 1181, 2009 WL 2823892, at *3 (N.D.N.Y. Aug. 31, 2009).

Here, there is no evidence that Oakfield and Coral "appear to make joint hiring and firing decisions . . . ," Lihli Fashions Corp., 80 F.3d at 747, "[n]or is there evidence from which a reasonable factfinder could conclude that [Oakfield] exerted control over the conditions of employment at [Coral]." Velez, 244 F.R.D. at 252. Likewise, there is little evidence as to how

each company maintained control over labor-related tasks "such as handling job applications, approving personnel status reports, and exercising veto power over major employer decisions." Parker, 204 F.3d at 341.

On the other hand, as set forth above, their employees did shift back and forth between the companies. See Finkel, 2008 WL 2483291, at *12 ("The undisputed facts show that all of the workers who were reported to the Funds as having worked for Podesta Trucking were actually drivers for Frattarelli Brothers."); Bourgal, 969 F. Supp. at 864 (concluding that there was sufficient evidence of centralized labor relations, in part because "the corporate defendants employed the same truck drivers."). Cf. United, 2012 WL 4092598, at *12 (There is no evidence of any shifting of employees back and forth between AWF–Erie and RCS–Erie."). "[W]here the one-time transfer of employees [may be] insufficient to support a finding of an interrelation of operations . . . , in this case it appears that [Coral] used [Oakfield] employees with at least some regularity". Laurin v. Pokoik, No. 02 Civ. 1938, 2004 WL 513999, at *5 (S.D.N.Y. Mar. 15, 2004) (citing Hermanv. Blockbuster Entertainment Group, 18 F. Supp. 2d 304, 306 (S.D.N.Y. 1998), aff'd, 182 F.3d 899 (2d Cir.1999)).

Thus, there is support for a finding that the single employer doctrine is applicable in the instant case based upon the factor of centralized control of labor relations.  .

### 3.  Common Management/Ownership

Next, the Court will assess the prongs of common management and ownership, which are generally accorded less weight by courts that conduct the "single employer" analysis.  Finkel, 2008 WL 2483291, at *12; Laurin, 2004 WL 513999, at *8.

Here, the companies have at all times been owned by members of the same immediate family.  Michael Jr. previously worked for Philomena's company, Oakfield, which she owned

until her death in May 2010. Since then, it has been owned by Michael Sr. her husband. Michael Jr., the son of Philomena and Michael Sr., has owned Coral since the company's inception. This familial relationship between the companies supports the notion of substantially identical ownership. See Lihli Fashions, 80 F.3d at 747 (finding two related companies, one owned by the mother of children who owned second company, to have common ownership and control where, inter alia, mother served as president and exercised ultimate business and artistic control over both entities); see also Bourgal v. Robco Contr. Ents., Ltd., 969 F. Supp. 854 (E.D.N.Y. 1997), aff'd, 182 F.3d 898 (2d Cir. 1999) (finding common ownership, management and supervision of three related companies owned by husband and wife found where husband controlled day-to-day operations and made employment decisions for all three companies).

In sum, based upon the undisputed facts, the Court finds that no rational factfinder could conclude that there was an arms-length relationship between the two companies. Accordingly, the Court concludes that as a matter of law, Oakfield and Coral had common management and ownership.

### 4. Bargaining Unit

Finally, the Court finds that the undisputed facts demonstrate that they represent an appropriate employee bargaining unit.

When assessing the appropriate bargaining unit, attention "shifts from the control, structure and ownership of the employer to the community of interests of the employees." Cuyahoga Wrecking Corp. v. Laborers Int'l Union of North Am., Local Union # 210, 644 F. Supp. 878, 882 (W.D.N.Y. 1986). "The reason for the appropriate bargaining unit requirement is to protect the rights of non-union employees to representatives of their choice, or to not have union representation at all." LaBarbera, 164 F. Supp. 2d at 326. In determining whether

employees constitute a single bargaining unit, the factors to be considered include "operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange." Brown, 250 F.3d at 128 n. 2; see LaBarbera, 164 F. Supp. 2d at 326 ("Eight factors are relevant in making this determination: geographic proximity, similarity of skills and functions, similarity of employment conditions, centralization of administration, managerial and supervisory control, employee interchange, functional integration of the employer, and bargaining history").

For the same reasons set forth above, operational integration, geographical proximity, and employee interchange are all present in this case. It is undisputed that the employees of both Coral and Oakfield perform the same job of driving trucks, and they work in the same geographical areas. See Labarbera, 2007 WL 4232765, at *6; LaBarbera, 164 F. Supp. 2d at 326 (finding an appropriate bargaining unit because "it is undisputed that the companies exchanged employees, the working conditions were the same at both companies, and the employees performed the same job of driving trucks."); Bourgal, 969 F. Supp. at 863 ("the Funds have demonstrated the existence of an appropriate bargaining unit. The contributions sought are for the same job classification—truck driver—and for the same type of work—driving a dump truck to transport excavated material.").

Therefore, in light of the circumstances of the case, the Court finds that based upon the undisputed facts, there was "an absence of an arm's length relationship found among unintegrated companies" and thus Coral and Oakfield constitute a single employer and that together they constitute an appropriate bargaining unit.

Coral contends in its opposition papers that Section 302(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(a), prohibits the payment of fringe benefit

contributions by Coral for employees of Oakfield to the Plaintiff Funds. The Defendant claims that "the LMRA makes it illegal as a general matter for an employer to make payments to union affiliated representatives and entities . . . beyond narrowly prescribed exceptions", none of which it maintains are applicable here. (Def.'s Opp. at 5.)

The Court finds this argument to be without merit. In another case in this district, the defendant corporation similarly argued that it could not legally make payments on behalf of another corporation's employees because it was not a union signatory and because there was no detailed basis upon which contributions owed could be determined. There, the court ruled that "the key to compliance with [the LMRA] is that payments be made on behalf of or for the benefit of those who are eligible to receive benefits—*i.e.*, union members." King v. Audax Constr. Corp., No. 02 Civ. 582, 2007 WL 2582103, at *6 (E.D.N.Y. Sept. 5, 2007). Thus, the Court concluded that if one corporation was found liable for unpaid contributions, the LMRA posed no bar to the court requiring the corporation to make payments to the Funds on behalf of a second corporation's employees.

In sum, as Coral and Oakfield are deemed to be a single employer as a matter of law, so that Oakfield's employees are also Coral's employees, there is no bar under the LMRA to hold Coral liable for contributions on behalf of Oakfield's employees.

**D. As to Whether There Is Joint and Several Liability for Coral's Employees**

Now that the Court has found that Oakfield and Coral may be held jointly and severally liable for delinquent contributions owed by Oakfield pursuant to the terms of the CBAs under which Oakfield was a signatory, the Court must address the Plaintiffs' next contention—that the two entities are also jointly and severally liable for contributions that were allegedly owed and not paid for Coral's employees.

If Coral and Oakfield were found to be a single employer under the analysis undertaken above but were not found to be an appropriate bargaining unit, then Coral would be liable for Oakfield's obligations under the CBA, but it would not be bound by the CBA itself. Thus, only if the Court finds that there is single bargaining status, will Coral also be bound by the CBA. See Mason Tenders Dist. Council Fund. V. ITRI Brick and Concrete, No. 96 Civ. 6754, 1997 WL 678164, at *13 (S.D.N.Y. Oct. 31, 1997) ("if an appropriate bargaining unit determination is not reached, then the nonsignatory corporation (Masonry) will not become a party to the CBA because to do so would bind the employees of the nonsignatory (Masonry) to a CBA they did not approve.").

In the present case, as the Court previously concluded that Coral and Oakfield constitute an appropriate bargaining unit, then it is proper for the Court to find that Coral is bound by the CBA. "Businesses comprising a 'single employer/single unit' for labor law purposes are jointly and severally liable for each other's obligations under collective bargaining agreements." Duffy, 2011 WL 573564, at *6. Consequently, it logically follows that if Coral is also bound by the CBA signed by Oakfield, then there is joint and several liability for covered work by Coral's employees as well as Oakfield's employees. See Truck Drivers Local Union No. 807 v. Regional Import & Export Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991) (holding that "single employer/single unit doctrine" has "the same binding effect on a non-signatory" as the "alter ego doctrine"); Stardyne, Inc. v. NLRB, 41 F.3d 141, 144 (3d Cir.1994) ( "When two entities are found to be a single employer, one entity's collective bargaining agreement covers the other entity as well, provided that the two entities' employees constitute a single appropriate bargaining unit."); see, e.g., Labarbera, 2007 WL 4232765, at *7 (awarding contributions to the Plaintiffs from both corporations, jointly and severally); Mason Tenders Dist. Council Welfare

<u>Fund v. ITRI Brick and Concrete Corp., ITRI Masonry Corp. and Antonio Rubino</u>, No. 96 Civ.

6754, 1997 WL 678164, at *17 (S.D.N.Y. Oct. 31, 1997) ("In other words, this Court holds that

Antonio Rubino is personally liable for Brick's obligations under the 1993 CBA, and if Brick

and Masonry are a single employer or alter egos, Antonio Rubino's personal liability extends to

all of Brick–Masonry's obligations under the 1993 CBA.").

     Certainly, the Court recognizes that there are legitimate concerns regarding the fairness

of imposing contract liability on a non-signatory.  However, that also appears to be the logical

extension of the single-employer doctrine.  As stated by the Supreme Court:

> In light of the general policies behind ERISA . . . [there is] the
> concern for assuring the financial integrity of the plans by
> determining the class of potential benefit claimants and holding
> employers to the full and prompt fulfillment of their contribution
> obligations [that] are proper and weighty within the framework of
> ERISA.

<u>Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.</u>, 472 U.S.

559, 572, 105 S. Ct. 2833, 2841, 86 L. Ed. 2d 447 (1985).

     In addition, the definition of "Employer" in the Trust Agreement is consistent with the

single employer doctrine, and it reflects the union's attempt to pierce double-breasted operations,

which are found where an owner operates one company that is a party to a labor agreement and

essentially owns a second company that is non-union, in order to achieve certain benefits.  An

Employer is defined as one who has duly executed a CBA with the Union, but it is also defined

as one who "adopts such agreement by its conduct."  (Cody Decl., Ex. A.)  Moreover, the CBAs

explicitly contemplates the prohibition of double breasted operations, stating that the signatory

employer "agrees that in order to protect and preserve the work opportunities of the Employees .

. . it shall not establish or participate in a double breasted operation within the geographical

jurisdiction . . ."  (Cody Decl., Ex. B.)  Accordingly, there is nothing in the governing documents

that would preclude an "Employer" from potentially including a non-signatory under certain circumstances.

Therefore, the Court grants the Plaintiffs' motion for summary judgment on the ground that Oakfield and Coral are jointly and severally liable for work by Coral's employees that would be covered by the relevant CBAs.

## E. As to Whether the Corporate Veil Should be Pierced to Hold Michael Jr. Personally Liable

The Plaintiffs also seek to pierce the corporate veil and hold the individual Defendant, Michael Jr., personally liable for the contributions owed, jointly and severally, along with Coral and Oakfield.

"[A]n individual is not liable for corporate ERISA obligations solely by virtue of his role as an officer." Sasso v. Cervoni, 985 F.2d 49, 50 (2d Cir. 1993). Rather, "[c]orporate principals have been held personally liable for a corporation's ERISA obligations in 'special circumstances'—such as those in which the court can properly pierce the corporate veil and conclude the officer is the corporation's alter ego". Trustees of Plumbers Local Union No. 1 Welfare Funds v. Dan Yant, Inc., No. 06 Civ. 173, 2007 WL 3036759, at *5 (E.D.N.Y. Oct. 16, 2007); see Sasso, 985 F.2d at 50 ("special circumstances" include: (1) knowingly participating in a fiduciary's breach of ERISA trust obligations; (2) conspiring to divert ERISA funds for personal benefit; (3) intermingling personal and corporate assets; (4) engaging in fraudulent conduct; or (5) where the individual is in fact the corporation or the corporation's alter ego"); Blackburn v. Iversen, 925 F. Supp. 118, 123 (D. Conn. 1996) ("this Circuit, as has the majority of other circuits, has also recognized that an individual officer or director may be held personally liable for the corporation's delinquent contributions under appropriate circumstances, for example, if 'piercing the corporate veil' or 'alter ego' liability can be proven; or if the individual

25

defendant commits fraud, acts in concert with a fiduciary to breach a fiduciary obligation; or if the individual officer or director personally assumes the obligations of the company under the collective bargaining agreement, thereby qualifying individually as an 'employer' under ERISA"); see, e.g., Cement & Concrete Workers District Council Welfare Fund v. Lollo, 35 F.3d 29 (2d Cir. 1994) (citing with approval cases holding corporate officers personally liable where they have committed fraud or acted in concert to breach a fiduciary obligation or where the director was the corporation's alter ego); Alman v. Danin, 801 F.2d 1 (1st Cir. 1986) (holding incorporators liable for judgment against corporation for unpaid contributions where evidence supported district court's holding that the corporate form should be disregarded); Textile Workers Pension Fund v. Oltremare, 764 F. Supp. 287 (S.D.N.Y. 1989) (holding controlling persons liable for unpaid contributions if evidence established that corporate form should be disregarded); Laborers Combined Funds of Western Pennsylvania v. Ruscitto, 848 F. Supp. 598, 599, n.1 (W.D. Pa. 1994) (allowing ERISA claim against individual defendants on piercing the corporate veil theory); Newspaper & Mail Deliverers' Union of New York & Vicinity v. United Magazine Co., 829 F. Supp. 561 (E.D.N.Y. 1993) (holding that complaint which alleged that individual defendants were alter egos of corporate employer properly alleged a claim under ERISA).

To protect employee benefits, courts attempt to ensure "a general federal policy of piercing the corporate veil when necessary." N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 647 (2d Cir. 2005); see also Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1220 (2d Cir. 1987) ("Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined."). Federal law "gives less deference to the corporate form than does the strict alter ego doctrine of state law

. . . ." Lowen, 829 F.2d at 1220 (quoting First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 630, 103 S. Ct. 2591, 2601, 77 L. Ed. 2d 46 (1983)). See also Lowen v. Tower Asset Mgmt., Inc., 653 F. Supp. 1542, 1551 (S.D.N.Y. 1987), aff'd, 829 F.2d 1209 (2d Cir. 1987) ("Although no explicit ERISA provisions pertain to piercing the corporate veil, the remedial thrust of ERISA is not to be frustrated by meticulous emphasis on the corporate form"); Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986) ("[t]he general rule adopted in the federal cases is that a corporate entity may be disregarded in the interests of public convenience, fairness and equity" (quotations and citations omitted)).

The test for piercing the corporate veil is a flexible one, which allows courts to "weigh the circumstances of the individual case." Retirement Plan of Untied Here Nat. Retirement Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d Cir. 2010). Courts typically look at the following factors: "(1) the absence of the formalities which are part and parcel of normal corporate existence, i.e., the issuance of stock, the election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) the perpetration of fraud by means of the corporate vehicle." Hanley v. Giordano's Restaurant, Inc., No. 94 Civ. 4696, 1995 WL 442143, at *3 (S.D.N.Y. July 26, 1995) (quoting Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 53 (2d Cir. 1984)). See Trustees of Bldg. Service 32B-J Pension, Health and Annuity Funds v. Hudson, 871 F. Supp. 631, 640 (S.D.N.Y. 1994) ("In determining whether a corporation is merely an alter ego of an individual, the court should consider a number of factors, including: (1) the absence of formalities that are part and parcel of the corporate existence; (2) inadequate capitalization; and (3) the use of corporate funds for personal rather than corporate purposes."); Goldberg, 1993 WL 361672, at *5 ("With one voice, the circuit courts have added specific and compatible criteria to this widely-accepted general test,

including: (1) the amount of respect given by the shareholders to the separate identity of the corporation and to its formal administration, (2) the degree of injustice that recognition of the corporate form would visit upon the litigants, (3) the intent of the shareholders or incorporators to avoid civil or criminal liability, (4) inadequate corporate capitalization, and (5) whether the corporation is merely a sham.").

With regard to idea of domination of the corporation and lack of respect for the corporate form, the undisputed facts certainly demonstrate the lack of an arms-length relationship between Michael Jr. and Coral that would indicate adequate respect for the corporate entity. There is factual support that Michael Jr. utilized Coral's assets as his personal "piggy bank", in that he used corporate funds for personal rather than corporate purposes, and did so in a randomized manner, so that there was a lack of formula for calculating his compensation from the corporation. See Goldberg, 1993 WL 361672, at *6 ("Missing from the Tyrnauers' management of Colonial and Regency is the type of arms-length relationship that would indicate adequate respect for the corporate entity. . . . Isaac Tyrnauer draws 20–25 yearly 'bonuses' of $500–$600; no formula exists for calculating these 'bonuses.'").

In this case, Michael Jr. used Coral's funds to pay for the entirety of his home's electric bills, although he only works out of one room in the house. See id. (noting that while the officer used a car paid by his corporation, he "occasionally" used the car for personal business). Although Coral was a Subchapter S corporation whose income was taxable to Michael Jr., the Court agrees that the Defendant has cited no authority for the proposition that this sort of tax treatment immunizes shareholders of Subchapter S corporations from veil-piercing when warranted. In addition, there was a failure to maintain corporate records, such as bylaws and stock certificates. See Passalacqua, 933 F.2d at 139. Coral never had a Board of Directors' or

shareholders' meeting. In fact, Michael Jr. testified that Coral has never had any directors or officers, although in his declaration he claims to be the president or chief executive of Coral.

On the other hand, the Plaintiffs have put forth no evidence to demonstrate any conduct sounding in fraud or intent to commit a wrong. See Carpenters Dist. Council of Kansas City Pension Fund v. JNL Constr. Co., Inc., 596 F.3d 491, 496 (8th Cir. 2010) ("However, we find the Funds did not produce sufficient evidence to show the absence of trial worthy issues on the second prong: whether JNL was used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud; or whether adherence to the corporate fiction sanctioned fraud, promoted injustice, or resulted in an evasion of legal obligations."); Board of Trustees, Nat. Shopmen Pension Funds v. Northern Steel Corp., 657 F. Supp. 2d 155, 161 (D. D.C. 2009) ("The Court finds that aside from conclusory allegations of commingled assets and ownership and control of the companies, Plaintiff has not set forth facts which indicate the individual defendants used the business entities to defeat public convenience, justify wrong, protect fraud, or defend crime."). There is no evidence to demonstrate that Michael Jr. used the funds of Coral to pay for personal expenses in order to perpetuate a fraud against the Plaintiffs.

The Plaintiffs assert that when domination is shown, no showing of fraud is required, citing Wm. Pssalacqua Builders, Inc. v. Resnick Develoeprs S., Inc., 933 F.2d 131, 138 (2d Cir. 1991). This contention is not easily discredited in light of precedent from this Circuit and others. See generally Sasso v. Cervoni, 985 F.2d 49, 51 (2d Cir. 1993) (expressly declining to decide the issue, as it "remain[ed] for future decisions to demarcate the area of individual liability for corporate ERISA obligations").

As an initial matter, the "Defendants' exclusive reliance on Wm. Passalacqua Builders v. Resnick Developers, 933 F.2d 131 (2d Cir. 1991) [to support this contention], and other cases

employing New York law in addressing the alter ego question, is misplaced." Seide v. Crest Color, Inc., 835 F. Supp. 732, 736 n.4 (S.D.N.Y. 1993). "[A] critical distinction between Wm. Passalacqua and this case is that the former was a diversity action alleging breach of contract, to which New York state law would clearly apply, whereas this case involves an attempt by plaintiffs to impose liability for unpaid ERISA obligations, a federal cause of action." Burke v. Hamilton Equipment Installers, Inc., No. 02 Civ. 519, 2006 WL 3831380, at *10 (W.D.N.Y. Oct. 16, 2006). The great weight of authority in this Circuit holds that federal common law, not state law, is controlling when evaluating liability in ERISA actions. See, e.g., Thomas v. Peacock, 39 F.3d 493, 503 (4th Cir. 1994) ("Because a rule of veil-piercing determines who is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law of veil-piercing."), rev'd on other grounds, 516 U.S. 349 (1996); Goldberg, 1993 WL 361672 at *4 ("Piercing a corporate veil in an action arising under ERISA 'is a question of federal substantive law, though state law may be used as a reference guide' ") (quoting Trustees of UIU Health and Welfare Fund v. New York Flame Proofing, Inc., 649 F. Supp. 843, 847 (S.D.N.Y. 1986), rev'd on other grounds, 828 F.2d 79 (1987)); United Food & Commercial Workers Union v. Fleming Foods East, Inc., 105 F. Supp. 2d 379, 388 (D.N.J. 2000) ("[I]t is settled that federal law governs liability for breach of a labor contract between a union and employer, including liability based on a theory of corporate veil piercing."). Thus, "[p]iercing a corporate veil in an action arising under ERISA 'is a question of federal substantive law, though state law may be used as a reference guide.'" Seide, 835 F. Supp. at 736.

In viewing the doctrine as a creature of federal law, there is "no litmus test in the federal courts governing when to disregard corporate form." Alman v. Danin, 801 F.2d 1, 3 (1st Cir. 1986) (citations omitted). "The general rule adopted in federal cases is that 'a corporate entity

30

may be disregarded in the interests of public convenience, fairness, and equity." Id. A large number of courts in this Circuit have pierced the corporate veil in circumstances indicating instances of fraudulent conduct. There are also a number of cases that have relied upon both a disregard of corporate formalities and some form of fraud to pierce the corporate veil. For instance, in Lowen v. Tower Asset Management, Inc., 829 F.2d 1209 (2d Cir. 1987), the Second Circuit held that individual corporate officers were liable for ERISA obligations, based upon evidence that they had acted in concert with fiduciaries in breaching fiduciary obligations, in addition to evidence that they had intermixed assets of the corporation with assets of their own and used corporate assets for their personal benefit instead of for meeting ERISA obligations. Thus, Lowen relied both on the principle that a person "who knowingly participate[s] in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries," id. at 1220, and on the disregard of corporate form, id. at 1220–21.

After reviewing the relevant case law, it appears that most opinions suggest that allegations of fraud or intent to utilize the corporate form for a wrongful purpose would make a stronger case to pierce the corporate veil. Also, there is no question that fraud is one of the criteria a federal court should consider when assessing whether to pierce the corporate veil in an ERISA action. See Hanley, 1995 WL 4442143, at *3 (noting the relevant criteria as "(1) the absence of the formalities which are part and parcel of normal corporate existence, *i.e.*, the issuance of stock, the election of directors, the keeping of corporate records, etc., (2) inadequate capitalization, (3) personal use of corporate funds, and (4) *the perpetration of fraud by means of the corporate vehicle*.") (emphasis added). However, the Court has not uncovered, and the Defendants have not provided, any case that mandates wrongful intent as a prerequisite for a court to pierce the corporate veil. See Retirement, 629 F.3d at 288 ("Although perhaps a

'germane' or 'sufficient basis for imposing alter ego status,' an 'anti-union animus or an intent to evade union obligations' is not a necessary factor.") (quoting <u>Goodman Piping Prods., Inc. v. NLRB</u>, 741 F.2d 10, 11 (2d Cir. 1984); <u>McGuinness v. Marvin Hammerman, Inc.</u>, No. 89 Civ. 2900, 1994 WL 172403, at *3 (S.D.N.Y. May 4, 1994) (appearing to indicate that it would be sufficient to pierce the corporate veil based only upon the disregarding of the corporation form).

Accordingly, based upon the strong showing that Michael Jr. had no respect for the separate identity of his corporation and to its formal administration, and the degree of injustice to the Plaintiffs that would result with recognition of the corporate form if Michael Jr. were permitted to hide behind the shield of his corporation, the Court finds that piercing the corporate veil is appropriate in this case, despite the fact that no wrongful conduct has been demonstrated. Ultimately, the Court is constrained to view the piercing of the corporate veil analysis through the prism of a relatively less deferential attitude to the corporate form than would otherwise be applicable under other federal statutes or state law. "This less deferential inquiry can be attributed to a statutory format which was intended 'to remove jurisdictional and procedural obstacles which in the past appear to have hampered . . . recovery of benefits due to participants who were otherwise being deprived of benefits due them.'" <u>Goldberg</u>, 1993 WL 361672, at *5 (quoting S. Rep. No. 127, 93d Cong., 2d sess., reprinted in 1974 U.S. Code Cong. & Admin. News 4639, 4838, 4871). The Second Circuit has held that "[c]ourts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined." <u>Lowen</u>, 829 F.2d at 1220.

Therefore, based upon the undisputed facts in the present case, the Court finds that it is proper to pierce the corporate veil and hold Michael Jr. jointly and severally liable for Oakfield's and Coral's obligations to the Plaintiffs.

**F.  As to Whether Oakfield Failed to Make its Books and Records Available for an Audit**

Finally, the Plaintiffs argue that they are entitled to summary judgment on their claim that Oakfield violated the Trust Agreement by failing to submit its books and records, and those of Coral, to an audit.  Under the Trust Agreement, the Plaintiff Trustees may at any time audit the books and records of an employer and "any entity affiliated" with that employer, if that employer has employees that do "the same type of work".  (Cody Decl., Ex. A, at 27–28.)  As set forth above, the Court finds there to be no genuine issue of material fact as to whether Oakfield refused to make its books and records available for an audit.  In addition, for all of the reasons set forth above, Coral also qualifies as an entity "affiliated" with Oakfield that has employees that do the same type of work as Oakfield.  Moreover, having established that the corporate defendants constitute a single employer and a single bargaining unit and are thus obligated to comply with each other's responsibilities under the CBAs, it logically follows that Oakfield and Coral are bound by the provision of the Agreement permitting Plaintiffs to audit an employer's books and records.

Accordingly, the corporate defendants are ordered to cooperate in an audit of their books and records as set forth in the provisions in the governing CBAs.

**G.  As to Damages**

Having found that all of the Defendants are jointly and severally liable for the payment of contributions under the CBAs and Trust Agreement, the Court now turns to the Funds' request for damages, as well as for attorney's fees and costs.  The Plaintiffs contend that the Court should hold Oakfield, Coral, and Michael Jr. jointly and severally liable for $2,777,185.74.  This amount consists of: (1) all contributions owed based on work performed by Oakfield and Coral drivers, as determined by the "estimated audit" of Oakfield and the analysis of Coral's invoices,

totaling $1,212,480.69; (2) interest totaling $730,320.11; (3) liquidated damages totaling $730,320.11; (4) per diem interest totaling $919.00; (5) audit costs of $3,160.00; and (6) attorney's fees and costs in the sum of $100,904.83.

With regard to the delinquent contributions of Oakfield, the Plaintiffs have provided a declaration by Theresa Cody, a senior member of the Collections Department for the Funds, as well as a declaration by the attorney of record.  (See Declarations of Theresa Cody and Peter Dechiara, Esq. in Support of the Plaintiff's Motion for Summary Judgment.)  Cody's responsibilities include, among other things, the collection of contributions from contributing employers such as Oakfield.  The Cody Declaration contains the applicable CBA and the related Trust Agreement.  As Cody's Declaration states, if an employer refuses to submit to an audit, as Oakfield did in the instant case, then the Trustees may estimate the amount of contributions owed based on one of two formulas found in the Trust Agreement.  As set forth above, the Court has found that Oakfield failed to submit to an audit for the period of October 2008 through October 2011, and thus Cody correctly applied the Trust Agreement's estimated contribution provisions to determine the amount of contributions owed to the Funds by Oakfield for that period.  (See Audit Report, Cody Decl., Ex. F.)

In accordance with Article IX, Section 1(f) of the Trust Agreement, the amount of contributions due from Oakfield was determined by taking fifty percent of the number of hours reported by Oakfield to the Funds for each of the relevant months and then multiplying that number by the applicable contribution rate.  The Plaintiffs utilized October 2010 as the base month, because under the terms of the Trust Agreement that was the month in which Oakfield reported the greatest number of hours to the Funds from the twelve remittance reports submitted by Oakfield preceding the first month in which it failed to remit the required report.  Applying

34

this formula, the Plaintiffs appropriately computed the total amount of estimated contributions owed for the period from October 2008 through October 2011 as $336,751.49, which the Defendants do not contest. (See Audit Report, Cody Decl., Ex. F.) Thus, the Court grants the Plaintiffs' request for delinquent contributions from Oakfield in the amount of $336,751.49.

With regard to interest, the Plaintiffs are also entitled to interest on the contributions that were untimely. ERISA section 502(g)(2) states, in pertinent part, that "interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26." See 29 U.S.C. § 1132(g)(2). Under the Trust Agreement, interest is calculated from "the first day of the month when the payment was due to the date when payment was made." (Trust Agreement at 30.) The Court now finds that the total amount of interest due on the estimated contributions for Oakfield for the period from October 2008 through October 2011, calculated from the first day of the month in which the contributions were due, at a rate of 18% through December 15, 2011, is $78,600.14. (See Audit Internet Worksheet, Cody Ex. F.) In addition, the Court agrees that the Plaintiffs should be awarded per diem interest, from December 16, 2011, at the daily rate of $166.07, until the entry of judgment.

With regard to liquidated damages, under ERISA, the Plaintiffs are entitled to liquidated damages in an amount equal to the greater amounts of the interest on the unpaid contributions, or 20% of the unpaid contributions. 29 U.S.C. § 1132(g)(2)(C). The Plaintiffs are requesting the interest on the unpaid contributions, and thus are entitled to liquidated damages in the amount of $78,600.14. In addition, as liquidated damages equals the interest amount, liquidated damages continues to accrue starting on December 16, 2011, at the rate of $166.07 per day, until the entry of judgment.

With regard to the delinquent contributions of Coral, the Plaintiffs have submitted the declaration of Ken Jones, an accountant at the firm of Wagner & Zwerman LLP ("W&Z"). W&Z was engaged by the Trustees to perform an agreed-upon procedures engagement with respect to Coral in order to determine whether Oakfield contributed to the Funds in accordance with the applicable CBAs. In this endeavor, two W&Z employees reviewed documents related to Coral and prepared two examination reports covering the periods from November 1, 2005 through June 30, 2006 (Audit #12-882) and July 1, 2006 to November 30, 2009 (Audit #12-874). In the process of conducting the examinations, W&Z reviewed invoices sent from Coral to third parties for trucking services performed by Coral employees. These invoices include information regarding relevant dates, truck numbers, locations, hours worked, hourly rates, and the total amount charged to the customers for each job. W&Z then calculated the total hours of trucking work performed by Coral for the periods covered by the examinations, and multiplied the Funds' applicable hourly contribution rate by the total hours worked. Based upon these examinations and calculations, the Plaintiffs contend the total contributions owed are $99,150.49 for the period covered by Audit #12-882, and $778,578.71 for the period covered by Audit #12-874.

However, the Court has several major concerns regarding the damages sought by the Plaintiffs in connection with the alleged delinquent contributions of Coral's employees. While as a matter of law, Coral and Oakfield may be treated as a single employer so that contributions may be owed for Coral's employees, the Plaintiffs have not specified the appropriate method to calculate the delinquent benefits of a non-signatory under this particular set of circumstances. In this regard, estimations are often extrapolated from previous remittance reports sent to the Funds reflecting the number of hours worked by their employees in covered employment for which contributions are due for the period at issue, as they were in the present case for Oakfield.

However, there are no remittance reports for Coral, as they are a non-signatory. Further, if there are no remittance reports, then under the CBA, the employer is deemed to have the number of employees that the Union reports in writing that the employer is employing, with each employee deemed to have worked 40 hours per week for the entire unreported period. (Cody Decl., ¶ 23.)

It does not appear that the Plaintiffs followed this formula in calculating Coral's delinquent contributions, nor do they provide the reason for failing to do so. Moreover, it is also unclear whether the invoices sent from Coral to third parties for trucking services performed by Coral employees would necessarily qualify as "covered" employment for which contributions would be owed. Therefore, at this time, the Court declines to award the requested damages award by the Plaintiffs for Coral employees, including delinquent contributions, interest, and liquidated damages. However, the Plaintiffs will be permitted to renew their request, namely to provide legal and factual support for the contributions and other damages sought in connection with the non-signatory Coral.

The Plaintiffs are also requesting an award of attorney's fees and costs. There is no question that the Plaintiffs are entitled to a mandatory award of reasonable legal fees and costs under 29 U.S.C. § 1132(g)(2). See Duffy, 2008 WL 822111, at *5.

To determine a fee award in the Second Circuit, the Court must decide the "presumptively reasonable fee" for the work performed in the case. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2008). First, the Court should "bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." Id. at 190. In this regard, the Court should look at what a paying client would be willing to pay, keeping in mind that a reasonable paying client would

wish "to spend the minimum necessary to litigate the case effectively." Id. Second, the Court

calculates the "presumptively reasonable fee" by multiplying the number of hours reasonably

expended on the litigation by the reasonable hourly rate. Id.

"In this Circuit, parties seeking an award of attorney's fees are required to submit

contemporaneous time records." Local 335, United Service Workers Union, IUJAT v. Roselli

Moving and Storage Corp., No. 09 Civ. 3583, 2010 WL 3283553, at *2 (E.D.N.Y. July 20, 2010)

(citing New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir.

1983)). The Court should exclude hours that it finds to be excessive, duplicative, or

unnecessary. Duke v. Cnty. of Nassau, No. 97 Civ. 1495, 2003 WL 23315463, at *1 (E.D.N.Y.

Apr. 14, 2003) (citing Hensley, 461 U.S. at 434; Luciano, 109 F.3d at 116)).

The Court has reviewed the Plaintiffs' submissions on this issue, and finds that the

attorney time sheets that were provided to the Court are sufficiently detailed. However, the rates

charged are not all reasonable within the forum of the Eastern District of New York. Prior to

July 2011, the Plaintiffs' law firm billed on an hourly basis at the rate of $370 per hour for

partner time; $300 per hour for senior associates; $275 per hour for junior associates; and $90

per hour for paralegals and law clerks. Beginning in July 2011, the Plaintiffs' firm billed $400

per hour for partner time; $375 per hour for senior associates; $275 per hour for junior

associates; and $110 per hour for paralegals and law clerks. (See Dechiara Decl. ¶ 15.) The

Court finds that fair and reasonable attorneys' fees within this forum are the following: $350 per

hour for partners; $275 per hour for senior associates; $225 per hour for junior associates; and

$90 per hour for paralegals and law clerks. See Konits v. Karahalis, 409 F. App'x 418, 422–23

(2d Cir. 2011) (affirming a district court decision holding that the prevailing rates for

experienced attorneys in the Eastern District of New York range from approximately $300 to

$400 per hour); Penberg v. HealthBridge Mgmt., No. 08 Civ. 1534, 2011 WL 1100103, at *6–7 (E.D.N.Y. March 22, 2011) (observing that "reasonable fees in this district vary from $200 to $375 per hour for partners and $100 to $295 per hour for associates" and $70 to $80 for paralegals or legal assistants); Blue v. Finest Guard Servs., Inc., No. 09 Civ. 133, 2010 WL 2927398, at *15 (E.D.N.Y. June 24, 2010) ("rates of $300 to $400 per hour for partners have been considered reasonable in the Eastern District.")

Therefore, the Plaintiffs are directed to file a proposed order for attorney's fees, reflecting the above stated hourly rates, on or before December 7, 2012.

Lastly, the Plaintiffs have requested costs and disbursements of $3,714.23, consisting of the filing fees, the cost of service of process, postage, photocopying, and court reporting services, all of which may be properly reimbursed. (Id. ¶ 17.) The Court finds all of these costs to be recoverable. Therefore, the Plaintiffs are awarded costs in the amount of $3,714.23. See 29 U.S.C. § 1132(g)(2)(D).

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Plaintiffs' motion for summary judgment as to liability is granted, so that Oakfield, Coral, and Michael Jr. are jointly and severally liable for the delinquent contributions of Oakfield's and Coral's employees; and it is further

ORDERED that the Plaintiffs are entitled to damages from the Defendants jointly and severally, in the amounts of $598,016.60, consisting of: (1) all contributions owed based on work performed by Oakfield drivers, totaling $336,751.49; (2) interest totaling $78,600.14, plus per diem interest at the rate of $166.07; (3) liquidated damages totaling $78,600.14, plus per diem interest at the rate of $166.07; and (4) audit costs of $3,160.00; and it is further

ORDERED that the Plaintiffs are directed to file a proposed order for attorney's fees, reflecting the above stated hourly rates, on or before December 7, 2012; and it is further

ORDERED that the Plaintiffs' request for delinquent contributions, interest, and liquidated damages in connection with Coral's employees is denied without prejudice. The Plaintiffs may renew their request for these damages on or before December 7, 2012. The Defendants may oppose this request on or before December 23, 2012. The Plaintiffs may submit a reply on or before January 7, 2012.

**SO ORDERED.**

Dated: Central Islip, New York
November 9, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge